[See Cases Nos. 17,200 and 17,202.]

## Case No. 17,202.

WARREN et al. v. TENTH NAT. BANK et al.

[10 Blatchf. 493;[1] 7 N. B. R. 481.]

Circuit Court, S. D. New York. March 3, 1873.[2]

PREFERENCE BY BANKRUPT — VALIDITY — KNOWLEDGE OF INSOLVENCY.

1. Knowledge of the non-payment of the commercial paper of a merchant, at maturity, furnishes reasonable cause to believe that he is insolvent.

2. Inability to pay commercial paper, in the due course of business, is, in the case of a merchant, insolvency.

3. A creditor holding the commercial paper of his debtor, in respect to which the debtor has committed an act of bankruptcy, by suffering it to remain unpaid in the hands of such creditor, for more than two months after its maturity, must be held to know that the debtor is insolvent and has committed an act of bankruptcy, if such creditor, instead of putting the debtor into bankruptcy for such act, proceeds to take measures to secure a preference over other creditors.

4. What constitutes insolvency in a debtor, and knowledge by him of his insolvency, considered.

5. If a debtor suffers a creditor to do acts which will secure a preference, and knows the consequences of such acts, he intends such consequences, because he can prevent them, by using the means provided to effect an equal distribution of his property among his creditors.

6. What constitutes, on the part of a creditor, reasonable cause to believe that he is obtaining a preference.

7. Where a debtor has committed no act of bankruptcy, and will not voluntarily petition, a creditor may sue him, so as to force him to commit an act of bankruptcy, and then himself proceed against him, for such act, in involuntary bankruptcy.

8. Motive and intent distinguished. To do an act, with knowledge of its consequences, is to intend the consequences.

9. Where a preference is obtained through a judgment, and a levy of execution, an assignee in bankruptcy may proceed, by a suit in equity, to set aside the lien, and may make the sheriff, as well as the creditor, a party, if the proceeds of the execution be still in the hands of the sheriff.

10. On awarding such proceeds to the assignee in bankruptcy, the sheriff was allowed his legal fees, and his costs of suit, and such costs were, with the costs of the assignee, charged on the creditor.

[Appeal from the district court of the United States for the Southern district of New York.]

Alexander Blumenstiel, for plaintiffs.
Henry E. Tremain, for Tenth Nat. Bank.
Brown, Hall & Vanderpoel, for the sheriff.

WOODRUFF, Circuit Judge. The bankrupts were, in and prior to the month of September, 1870, merchants and traders, in the city of New York. In August, 1870, their bank checks, drawn in their firm name of E. P. Sanger & Company, on the Central National Bank in the city of New York, dated, one, August 23d, 1870, for $4,891.64, and one, August 24th, 1870, for $4,651.37, were received in the regular course of business, and were held by the defendant, the Tenth National Bank, and, upon presentation thereof to the bank on which they were drawn, payment was refused, and the same remained unpaid, the drawers soliciting and obtaining delay of prosecution thereon, by the assurance of a hope that they should, by a successful continuance of their business, be able to pay them. It is proved, also, by the testimony of one of the bankrupts, that, in September, 1870, the firm failed, and never afterwards resumed payment "generally" of their debts. By this qualification, the witness' explanation shows that he meant that they, after their failure, bought a few bills for cash, and paid certain of their notes, open accounts, or checks, which were specially arranged for and absolutely necessary to carry on their business. They owed, when they failed, from $150,000 to $200,000. The distinct and only reason why they did not pay the checks held by the defendant, the Tenth National Bank, was, that they had no money, and the proofs show that, in fact, they were insolvent. I do not deem it very material, but it is also proved, that the firm of E. P. Sanger & Co. had also failed some time previously, and had compromised

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[2] [Reversing Case No. 17,200. Decree of circuit court reversed by supreme court, in 96 U. S. 539.]

with some of their creditors; and it was represented to the president of the bank, by the person from whom the checks were received, as an inducement to delay the prosecution of the checks, that the firm had compromised with their creditors, and that his brother, (E. P. Sanger,) was in a "most excellent condition," and would be able to make a satisfactory arrangement in the fall. The president of the bank, in his testimony, shows, that, in his apprehension, the non-payment of the checks indicated, per se, inability to pay; and the negotiations for delay, and the urgency employed to gain an extension of time, and the assurance of expected future ability, show, conclusively, that he knew that the debtors had not then present ability to pay the checks, and he was distinctly told, that "any pressure on the part of the bank would embarrass E. P. Sanger." In September, as testified, the firm failed, which must mean, I think, that they were unable to meet their other obligations, and suffered them to remain unpaid, as herein above stated. The checks remained unpaid, and, on the 3d of November, the bank commenced suits thereon, in which judgments were recovered against the bankrupts on the 12th of January, 1871, by default. The defendants therein, having no legal defence, submitted to such recovery without opposition, and without taking any measures to prevent the bank from obtaining any advantage which might be gained by such judgment and the execution thereof by seizure and sale of their goods; and, on the same day, executions were issued and levied upon the goods of the debtors. After such levy, the debtors, who appear to have been engaged in an endeavor to compromise again with their creditors, urged the bank to withdraw the levy, they, apparently, still hoping, that, by a compromise with their creditors, at 45 cents on the dollar, they might extricate themselves from their difficulties; and, yielding to solicitation, the bank delayed a sale under the executions. During this delay, and while the goods were in the custody of the sheriff under the levy of such executions, a petition was filed by other creditors, on the 24th of February, 1871, in the district court, upon which the debtors were adjudged bankrupts, and the complainants in this suit were appointed assignees. The district court issued an injunction, restraining the bank and the sheriff from disposing of the goods of the debtors so held, which injunction appears to be in full force, except so far as modified by an order which permitted the sale of the goods, the sheriff to hold and retain the proceeds of sale, and the said injunction to apply thereto, with the same force and effect as it applied to the property before such order was made. This suit was thereupon commenced against the bank, to avoid the lien of the executions and levy, establish the title of the assignees in bankruptcy, and obtain possession of the moneys so held, and the sheriff is made a party defendant, as the custodian of the fund in dispute, and, in order that the adjudication herein may be conclusive upon both, and as protection

to the sheriff against any claim of the bank upon him, but, otherwise, or beyond this, no personal claim is made on the sheriff. The bill herein was dismissed, with costs, in the district court, on the ground, that it did not appear that the bank, when the levies were made, had reasonable cause to believe that the debtors intended, by suffering the executions to be levied, to give the bank a preference, or that the bank intended to obtain a preference, or that any fraud on the bankrupt law was intended by either. [Case No. 17,200.] The assignees have appealed to this court, and here the claim of the assignees to the fund in question is resisted upon various grounds, which, so far as I think material, will be briefly noticed, or, at least, be covered by the conclusions which will be stated.

I. (1.) Before the suits were commenced, the bank had reasonable cause to believe that the debtors were insolvent. The non-payment of their commercial paper at maturity was, of itself, sufficient cause for such a belief, as has more than once been held, in this circuit. But, added to this, the proofs above recited show, that the president of the bank knew that the non-payment was by reason of inability to pay; and, inability to pay, in due course of business, is, in fact, in the case of a merchant, insolvency, within the meaning of that term. This has been so often adjudged, in giving a construction to the bankrupt law [of 1867 (14 Stat. 517)], that it has passed into a maxim. Nor is this all. The president of the bank was informed, before the suits were commenced, that, if the bank should press the debtors for payment, it would embarrass the debtors. This was a singular expression to apply to debtors who, as he knew, were already in a condition in which they could not meet their bank checks, and were urging for delay; and it could only mean, that, if the bank attempted coercion, it would break up their business. I am aware, that it was represented that the debtors were "in excellent condition," and that, if not pressed for payment, there was ground of expectation that they would soon be able to pay. But, this does not make it less certain, that they were, in fact, then insolvent, and that the president of the bank knew the facts constituting insolvency in the law; and it is quite impossible to hold, upon all these proofs, that the bank had not, when the suits were commenced, reasonable cause to believe such insolvency. The contrary is inevitable, from facts which are proved and, in substance, admitted by the president of the bank himself.

(2.) Before the commencement of the suits, the debtors had committed an act of bankruptcy, and the bank knew it. Non-payment of the checks, (which were commercial paper,) and neglecting to pay them for more than two months, was, itself, an act or acts of bankruptcy. It is true, that a solvent man can commit an act of bankruptcy, but, it is not according to the usual course of events, for solvent persons to commit such acts of bankruptcy as these; and the bank should be held

to the just and reasonable inferences from such acts, when, instead of proceeding, as the bank might have done, to have the debtors adjudged bankrupt, and compel that equal distribution which the bankrupt law aims to secure, it adopted measures which, if successful, must result in giving itself a preference over other creditors.

(3.) All the facts of which the bank had knowledge, and those which the bank had reasonable cause to believe, were perfectly and fully known to the debtors themselves. They knew they were insolvent within the meaning of the law, and they were, in fact, insolvent, in every sense of the term.

(4.) The debtors also knew, that, if they submitted to suits, judgments, levies and sale of their goods, for the payment of the bank, it would give the bank a preference over other creditors, whom they could not pay. It is very true, that they were reluctant to be sued; they implored further delay; they begged to have the levies withdrawn; they earnestly desired to struggle on yet longer, for the purpose of an endeavor, at least, to make such profits in their business as would enable them to pay the bank, and enable them to compromise with their creditors. Possibly, they deemed such a result probable, if time were given them; but, from the moment suits were brought, they knew—they must have known—that, if those suits were carried to judgments, executions, sales, and the receipt of the money, this would give to the bank a preference over other creditors. In this condition of things, if they had themselves sold a portion of their goods, for the purpose of paying the bank in full, and had made that payment, it would have been an illegal preference, plainly and intentionally so. Standing by and suffering the same result, with certain knowledge of the consequence, was suffering the bank to gain such preference; and it is doing violence to reason, good sense and the proper meaning of language, to say, that debtors do not intend the necessary consequence of their acts, or of the acts which they permit or suffer to be done, and which they can prevent, if they will, by the means which the law places at their command, to effect a legal and equal distribution among their creditors.

(5.) The like observations, in the particulars last named, apply to the bank. Having the knowledge it possessed, it is very little to say, that it had reasonable cause to believe that the necessary consequence of success in its suits, if it obtained a levy and sale and collected its judgments, would be to gain a preference, and that the debtors would not be able to pay their other creditors. In this view, it is wholly immaterial whether other debts were then due and payable, or not. From the moment the suits were begun, and begun, as they were, with the express notice above mentioned, that, if there was any pressure, the debtors would be "embarrassed," or, in other words, would be in no situation to pay their debts, they acted in disregard of the duty of the debtors to provide

for the equal distribution of their property, in like disregard of the right of other creditors to such distribution, and with the single purpose to compel payment to themselves, at all events. They had not the apology for bringing suit, which creditors often have, where the debtor has committed no act of bankruptcy, and will not himself voluntarily apply to be declared a bankrupt, and so commit his estate to that distribution which the law provides for. Such a creditor may properly sue, and, by so doing, force his debtor into an act of bankruptcy, upon which proceedings in bankruptcy may be taken against him by the creditor himself so suing. Here, an act of bankruptcy had been committed, and it was known to the bank. Why did they not proceed thereupon? Plainly, because they were seeking to compel payment to themselves, without regard to other creditors. Both the president and the debtor deny an intent to prefer the bank. This is not unusual. The debtor may, no doubt, truthfully say, that the motive which governed him was not a preference for the bank over other creditors. As to both of the witnesses, it is plain, that they regard motive and intent as identical. Not so. An intent often exists, where a motive is wholly wanting, and mere indifference exists. When a man does an act, or omits to do an act, with knowledge of the consequences, he intends the consequences, just as truly as he intends to do, or to omit, the thing done or omitted.

(6.) These conclusions make the conduct of the bank and of the debtors a fraud upon the bankrupt law. The bank intended to procure payment, without regard to the other creditors. The debtors knowingly, and, therefore, intentionally, suffered the bank to go on to secure this object, knowing and, therefore, intending this result. Otherwise, they would, as easily they might, have prevented it. All this was, of course, known to the bank.

(7.) These views bring the present case distinctly within the decision of this court in Smith v. Buchanan [Case No. 13,016], and within the opinion of the supreme court, recently pronounced (Buchanan v. Smith [16 Wall. (83 U. S.) 277]), affirming the decision in that case. The facts are, in every material particular, identical. Cases might be multiplied, similar in principle. See Haskell v. Ingalls [Case No. 6,193]. And the opinion of Dillon, Circuit Judge, in Vanderhoof v. City Bank [Id. 16,842], expresses like views. I find no ground for sustaining the claim of the bank to the fund in question, without retracting very much that has been announced in the opinions of this court, and rejecting the opinions of most of the judges called to administer the bankrupt act. The opinion of the supreme court, on affirming the decision of this court in Smith v. Buchanan [supra], is very full in support of the views above expressed. It denominates the silent acquiescence of the debtors, without invoking the protecting shield of the bankrupt act, "the passive assistance" rendered by the debtors to the procurement of

the lien which would necessarily, if not defeated, give the creditors an illegal preference, and would be a fraud upon the act.

II. It is urged, that the remedy of the assignees was at law, and not in equity; and that the bill should have been dismissed upon that ground, also. The object of the bill was, to set aside the lien of the judgments of the bank, and of the executions upon the personal property of the debtors. Until that was done, the sheriff, who made his levy before the proceedings in bankruptcy were commenced, was acting in the clear line of his duty. He ought not to be proceeded against, or called upon to settle the question in conflict on his own responsibility, nor without such a proceeding as would, by concluding the bank, protect him in delivering the property levied upon to the assignees. Without asserting that the assignees could not maintain trover or replevin against the sheriff, I am of opinion, that a bill in equity was the most convenient and effectual. It enables the court to settle the rights of all the parties in one suit, and not leave the sheriff to a further litigation with the bank. Had trover been brought against the sheriff, he might, with great propriety, have applied to a court of equity to protect him, by bringing the real parties to the controversy into actual contest, for his protection. The sale of the property by order of the bankrupt court does not change the case in that respect. The order of that court substituted the money in the hands of the sheriff for the property itself, to be held by him under the injunction previously granted, and with the like effect, directly and incidentally, as he held the property before the sale. Smith v. Buchanan was a suit in equity, like the present, and numerous other like suits have been brought and sustained in the several circuits.

III. On behalf of the sheriff, it is insisted, that he is an officer of the state courts, and held the property by virtue of their mandate; that this is an interference with the authority and jurisdiction of the state courts; and, therefore, that the sheriff ought not to be made a party. There is nothing in this. The proceeding no more interferes with him, or with the state courts, than would an action of trover or replevin, when he levies upon and retains property which he has no right to apply, to pay an execution. He is made a party for his own protection, and because he holds the subject of the controversy. No decree is sought, and none should be made, affecting him, otherwise than as the custodian of the fund, and to secure the control of the court over it. He has in no other sense any personal interest in the controversy, and ought not to be prejudiced, in any manner, by the decree. If he had been sued at law, he would have been in a worse position, and might have found it necessary himself to apply to a court of equity for protection. Having actually taken the property, he would have had no bond or other indemnity from the bank, against the claim of the assignees.

The proofs show, that the sheriff has the money in his possession. His counsel, on the argument, stated, that, by direction of the state court, he had paid the money to the other defendant. But, no such fact is before the court.

The decree of the district court must be reversed, and a decree be entered awarding to the complainant the proceeds of the sale of the property in question, but allowing the sheriff any legal fees which have not been paid to him, and, also, his costs in this suit, but charging the other defendant with such costs, and also with the costs of the complainants herein.

[Upon an appeal to the supreme court, the decree of this court was reversed, and that of the court below, dismissing the bill, with costs, affirmed. 96 U. S. 539.]